Kurt F. FROEBEL, Petitioner-Appellant,

v.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,
Respondent-Respondent.

Court of Appeals

*No. 97–0844. Submitted on briefs January 8, 1998.—Decided
March 4, 1998.*

(Also reported in 579 N.W.2d 774.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *William S. Roush, Jr.*, and *Rachel A. Schneider* of *Davis & Kuelthau, S.C.* of Milwaukee.

On behalf of the respondent-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Steven B. Wickland*, assistant attorney general.

Before Snyder, P.J., Brown and Nettesheim, JJ.

NETTESHEIM, J. The issue in this case is whether the Wisconsin Department of Natural Resources (DNR) may be ordered to take specific remedial actions based on findings made in the context of an administrative hearing that the DNR's removal of an

abandoned dam caused harm to the environment. The administrative law judge (ALJ) determined that he did not have the authority to compel the DNR to so act. The circuit court upheld this determination on judicial review, and the court additionally determined that it also did not have such authority. Kurt Froebel challenges this ruling on appeal. Because we conclude that Wisconsin law does not allow an administrative or judicial authority to issue a mandatory injunction against the DNR, we affirm the circuit court order rejecting Froebel's request for such relief.

Froebel additionally appeals the circuit court's affirmance of the ALJ's determinations that (1) the DNR did not violate the public trust when it caused the discharge of silt and sediment into the Oconomowoc River and North Lake, and (2) the DNR did not own and operate a point source of pollution within the meaning of § 283.31(1), STATS. We also reject Froebel's challenges to these rulings.

## BACKGROUND

The facts concerning the DNR's actions in this case, although lengthy, are not in dispute. Our recitation of that history is taken in large part from the ALJ's findings which were confirmed by the circuit court.

This case involves the removal, or "drawdown," of Funk's Dam which is located approximately one mile upstream of North Lake on the Oconomowoc River in the Town of Merton in Waukesha County. The dam was built in 1850 and was "washed out" in 1965. In 1971, the DNR notified the dam's owner that the dam was in poor condition and in need of repairs. After the owner refused to comply with the DNR's recommendations, the DNR declared the dam "unsafe and abandoned." When funds became available to the DNR

for the removal of unsafe dams in 1992, the DNR commenced the removal process of Funk's Dam.

On August 17, 1992, the DNR began to dismantle the impoundment behind the dam in anticipation of the dam's removal. The following day, the DNR prepared a public notice requesting comments on its proposal to remove the dam and suggestions regarding its Environmental Assessment for the removal project. An informational meeting was held on September 9, 1992, and on September 17, 1992, the DNR issued its decision ordering that the dam be removed. During this process, the DNR gave assurances that its plan for removal of the dam would not cause harm to the environment. On October 2, 1992, the DNR began removing the dam.

On October 12, 1992, the North Lake Management District (District) filed a petition for a contested case hearing challenging the DNR's decisions to remove the dam and to not obtain an Environmental Impact Statement (EIS) regarding the project. The DNR granted the District's request for a contested case hearing as to the removal of the dam. However, the DNR denied the District's request for a contested case hearing on the need for an EIS. The division of hearings and appeals assigned an ALJ to preside over the matter. *See* § 227.43(1)(b), STATS.

The administrative proceedings were stayed pending a judicial resolution of whether the District had a right to a contested case hearing under § 227.42, STATS., regarding the EIS. In *North Lake Management District v. DNR,* 182 Wis. 2d 500, 506, 513 N.W.2d 703, 705 (Ct. App. 1994), this court held that "the District does not have the right to a contested case hearing so long as there was an opportunity for public participation and a reviewable record was assembled." Our

657

decision did not address whether a contested case hearing was required as to the removal of the dam because the issue was not before us.

Following our decision, the administrative proceedings resumed and Froebel was permitted to intervene. Later, the District and the DNR entered into a Cooperative Agreement under which the District withdrew its request for a contested case hearing regarding the removal of the dam. That left Froebel and the DNR as the remaining litigants and the matter proceeded to a contested case hearing on the issue of the removal of the dam.

Following the hearing, the ALJ determined that "[t]here is no real factual question that Funk's dam was unsafe and was dangerous to life[,] health and property prior to removal by the Department. . . . A clear preponderance of the credible evidence supports a Finding that the Department's decision to remove the Funk's dam was reasonable given Department concerns about public safety and sediment transport." The ALJ then identified the central issue as "whether the [DNR]'s implementation of its decision to remove the Funk's dam was reasonable, necessary and appropriate based upon information foreseeable to the DNR at the time of dam removal."

The information available to the DNR at the time of the dam removal consisted of studies performed by its employees. At some point in 1992, William Sturtevant, Assistant State Dam Safety Engineer, developed a drawdown plan for the impoundment behind the dam. The plan set forth the minimum requirements for the contractor undertaking the draining of the mill pond. The steps and procedures included, among other things, building sediment barriers prior to the initiation of a drawdown in order to control erosion and

installing a combination of pumps and siphons along the embankment.

In addition to the Sturtevant study, the DNR had an earlier study performed by DNR employee Michael Bozek in 1986. Bozek conducted a mill pond sediment survey of the potential depth, distribution and transport of sediment then located upstream of the dam. Bozek's study made recommendations to reduce the mass of sediment transported downstream upon the dam's removal such as slow lowering of water levels and the construction of a sediment pit in front of the existing dam.

With respect to the DNR's compliance with these recommendations, the ALJ found that "[t]here is no question that some of the significant features of both the Bozek recommendations and of the Sturtevant drawdown plan were not followed during dam removal." In addition, the dam was only partially removed. Froebel argues that the failure to follow the plans and to undertake certain other sediment control measures led to massive sediment discharges that could have been prevented. Froebel's expert, University of Wisconsin—Milwaukee Professor Jerry Kaster of the Great Lakes Studies and Biological Sciences Department, testified that the DNR's actions in removing the dam did not adequately provide for sediment control and were not consistent with the recommendations by its own personnel.

The ALJ determined that Froebel had established that the dam's removal had resulted in a considerable amount of sediment being discharged into the Oconomowoc River directly causing large new muck and silt bars. A 1995 draft study performed by R.A. Smith noted that there were noticeable sediment beds downstream of the STH 83 bridge and in the inlet to North

Lake and that these deposits may have negative effects on the fishery of the river and lake as well as the water clarity of the lake. Kaster's study of the area before, during and after the drawdown confirmed that "a large volume of sediment was transported as a result of the dam removal and that hundreds of tons of excess sediment continue to be deposited in North Lake as a result of the partial dam removal."

Based on the evidence, the ALJ made the following findings:

> A preponderance of the credible evidence supports a finding that a large amount of sediment was discharged into the Oconomowoc River and into North Lake as a result of the partial removal of the Funk's dam. The record taken as a whole also establishes that these navigable waterways have been detrimentally impacted by the manner in which the partial dam removal was undertaken. It is difficult to sort out what portion of the increase of sediment transport is directly the result of the failure of the Department and its contractor to undertake the dam removal in a manner that better limited sediment transport. What is clear from the record is that the possibility of transport of a large amount of sediment was foreseeable to the Department. The DNR had sound reasons for removal of the dam; the Department properly planned for removal of the dam. However, as the dam was removed, the Department was too quick to throw out its drawdown and removal plans as being impossible to perform. While it is difficult to sort though the cause and effect of the Department's actions in this case, the evidence supports a finding that the failure to follow the recommended drawdown and removal plans was a cause of the release of a large volume of sediment into public waters.

In spite of its finding that the DNR's actions had caused, or at least significantly contributed to, environmental damage in the Oconomowoc River and North Lake, the ALJ determined that the statutes did not provide Froebel a remedy. The ALJ stated:

> This case has a unique and extensive procedural posture that raises serious issues as to the jurisdiction and authority of the ALJ. This case was not noticed as an enforcement action or as a hearing on the reasonableness or necessity for any remedial actions by the Department or its contractor. There is no specific statutory authority for the ALJ to Order remedial actions by the Department or its contractor in light of the Division's conclusion that the failure to follow the drawdown and removal plan contributed to the release of sediment into the waters of the state. Under these circumstances, the ALJ believes the best course is to remand the case back to the Department to take such actions as the DNR sees fit under the circumstances.

On March 22, 1996, Froebel filed a petition for judicial review of the ALJ's decision. Froebel argued that the ALJ had acted arbitrarily, capriciously and contrary to Wisconsin law in concluding (1) that the DNR did not own or operate a "point source" which discharged pollutants into the water, and (2) that the ALJ did not have the legal authority to require the DNR to remove the fill, sediment and silt which was discharged and placed on the bed of the Oconomowoc River and North Lake. Froebel argued that such authority existed under § 30.03(4)(a), STATS.

Besides challenging these rulings by the DNR, Froebel additionally requested that the court grant him relief pursuant to § 227.57(5) and (9), STATS., by enjoining the DNR to remove the fill, silt and sediment

bars in the Oconomowoc River and North Lake. In response, the DNR filed a motion to dismiss Froebel's request for injunctive relief because such relief would be "unavailable within the context of a judicial review action and beyond the jurisdiction and authority of the court to grant in a ch. 227, STATS., judicial review."

On December 27, 1997, the circuit court issued a decision concluding that the court did not have the power in a special proceeding to enjoin the DNR as requested. The circuit court granted the DNR's motion to dismiss those portions of Froebel's petition which requested injunctive relief. The court additionally affirmed the ALJ's decision. Froebel appeals.

### DISCUSSION

■

When an appeal is taken from a circuit court order affirming an agency decision, we review the decision of the agency, not the circuit court. *See Barnes v. DNR*, 178 Wis. 2d 290, 302, 506 N.W.2d 155, 160 (Ct. App. 1993), *aff'd*, 184 Wis. 2d 645, 516 N.W.2d 730 (1994). "Although we do not defer to the opinion of the circuit court, that court's reasoning may assist us." *Id*. Review of an agency's decision is confined to the record. *See* § 227.57(1), STATS.

### *The Statutory Authority of the ALJ and the Circuit Court*

■

The primary issue in this case is whether the DNR may be ordered, by either the ALJ or the circuit court, to take specific remedial actions based on findings made in the context of an administrative hearing under ch. 227, STATS. Because this issue turns upon the statutory authority of the ALJ and the circuit court, it

.

presents a question of law which this court reviews de novo. *See Loomis v. Wisconsin Personnel Comm'n*, 179 Wis. 2d 25, 30, 505 N.W.2d 462, 464 (Ct. App. 1993).

As a threshold matter, we reject the DNR's argument that Froebel's claim was improperly before the ALJ because a dam removal decision is not subject to a contested case hearing. *See* § 31.253(3), STATS. Regardless of whether the DNR's argument on this point is correct, the fact is that *in this case the DNR granted Froebel's request for a contested case hearing on the question of the dam removal.* When granting Froebel's motion to intervene in the dam removal proceedings, the ALJ stated: "[I]t appears Mr. Froebel was exercising his Ch. 31 public trust rights in attempting to intervene in the *contested* case proceedings." (Emphasis added.) The ALJ was never asked to substantively answer whether Froebel was entitled to a contested case hearing on this question. As a result, the ALJ identified the issue at the hearing as "whether the Department's implementation of its decision to remove Funk's dam was reasonable, necessary and appropriate." The DNR has waived this argument, and we do not address it further. *See DOR v. Wisconsin Tel. Co.*, 72 Wis. 2d 259, 267, 240 N.W.2d 411, 415 (1976).

We therefore turn to whether the ALJ correctly determined that it did not have the authority to grant the relief which Froebel sought in this case. In doing so, we bear in mind that the authority and powers of an administrative agency are statutorily created and defined solely by the legislature. *See Jocz v. LIRC*, 196 Wis. 2d 273, 292, 538 N.W.2d 588, 593 (Ct. App. 1995). If there is any reasonable doubt as to the existence of an implied power of an administrative agency, it

should be resolved against the exercise of such authority. *See id.*

Froebel first argues that the ALJ had the authority to order the DNR to undertake remedial actions under § 30.03(4), STATS. The ALJ determined that § 30.03(4) "does not provide authority for the ALJ to reach the issue of the proper remedies to restore the environment in light of the release of sediment." We agree with the ALJ's determination.

■

When the facts are undisputed, the construction of a statute presents an issue of law subject to our independent review. *See Ellingsworth v. Swiggum*, 195 Wis. 2d 142, 147, 536 N.W.2d 112, 114 (Ct. App. 1995). The primary goal of statutory construction is to ascertain the legislature's intent, and the first step in the process is to look to the plain language of the statute. *See State v. Sostre*, 198 Wis. 2d 409, 414, 542 N.W.2d 774, 776 (1996). Where the import of that language is clear and unambiguous, we simply apply the statute to the facts of the case. *See Cary v. City of Madison*, 203 Wis. 2d 261, 264, 551 N.W.2d 596, 597 (Ct. App. 1996).

Section 30.03(4)(a), STATS., provides in relevant part:

> If the department learns of . . . a possible infringement of the public rights relating to navigable waters, and the department determines that the public interest may not be adequately served by the imposition of a penalty or forfeiture, the department may proceed as provided in this paragraph . . . . The department may order a hearing under ch. 227 concerning the possible . . . infringement, and may request the hearing examiner to issue an order directing the responsible parties to perform or refrain from performing acts in order to fully protect

the interests of the public in the navigable waters

. . . .

Froebel argues that this statute authorizes the ALJ, as the designee of the DNR, to take specific remedial actions with respect to Funk's Dam.[1] The plain language of the statute indicates otherwise.

██

Section 30.03(4)(a), STATS., clearly contemplates the DNR as the initiator of the proceedings. Likewise, it is the DNR which "may request the hearing examiner to issue an order." The DNR did not initiate a proceeding under this statute. Nor did the DNR ever request any ALJ to issue any order under this statute. Instead it was Froebel who requested the ALJ to order the DNR to take remedial action. We hold that § 30.03(4)(a) does not contemplate the scenario envisioned by Froebel in which the DNR would bring an enforcement action against itself.[2]

---

[1] Froebel cites to various sections of ch. 227, STATS., for his contention that the ALJ becomes the designee of the department. These provisions merely prescribe how hearings which the DNR is required to conduct are assigned to an ALJ. In that sense only is the ALJ a "designee" of the DNR, and these provisions do not allow for an interpretation that the DNR can, in effect, bring an action against itself.

[2] We therefore reject Froebel's attempt to liken this case to those in which the ALJ, acting upon a request of the DNR, has ordered private parties to take remedial action. *See Application of Aqua Sports, Inc., for a Permit to Construct, Operate and Maintain Four Piers on the Bed of Lake Delton, Village of Lake Delton, Sauk County, Wisconsin,* Case No. 3-SD–85–709, 1985 WL 21112 (Wis. Div. Hrg. App.) ("[T]he Department requested that the hearing serve as a hearing under sec. 30.03, Stats., and that an order, if deemed proper under that section be issued subsequent to the hearing."); *In the Matter of the Complaint of Anthony and Lucille Lemanski and John and Claudia Niemiec*

Moreover, the ALJ correctly noted that the "instant proceeding was not noticed as a sec. 30.03, Stats., enforcement proceeding." Such a proceeding is brought *after* the DNR determines that "the public interest may not be adequately served by the imposition of a penalty or forfeiture." *See* § 30.03(4)(a), STATS. Again, the plain language of the statute contemplates the DNR as the enforcer, not the object, of an enforcement action. Here, the DNR did not consider or request a penalty or forfeiture against itself. Instead, the hearing before the ALJ was noticed upon Froebel's request for a contested case hearing under ch. 227, STATS., not as an enforcement proceeding under § 30.03(4)(a). Contrary to Froebel's assertion, § 30.03(4)(a) does not authorize the ALJ to order the DNR to take specific remedial action.

Next, Froebel turns to the circuit court's powers in a ch. 227, STATS., review proceeding. Froebel argues that the "plain language of § 227.57, Stats., provides specific authority for the circuit court to order injunctive relief of the nature requested by Appellant in a § 227.52 proceeding." We are unpersuaded. Section 227.57(2) provides that the court should affirm the agency's decision "[u]nless the court finds a ground for setting aside, modifying, remanding or ordering agency

*Regarding an Alleged Illegal Pier Owned and Maintained by John W. and Linda L. Meudt, et al.*, Case No. 3-SD–81–904; 1983 WL 17839 (Wis. Dept. Nat. Res.) ("The Division of Natural Resources Hearings has the authority pursuant to secs. 227.012 and 30.03(4)(a), Stats., to issue an order directing parties . . . to perform or refrain from performing such acts as may be necessary to fully protect and effectuate the interests of the public in those navigable waters."). In these instances, it was the DNR which sought remedial action against certain entities—not the other way around as in this case.

action or ancillary relief under a specified provision of this section . . . ." Here, however, the circuit court expressly stated that such grounds did not exist. Having upheld the ALJ's findings and conclusions, the court was not permitted to compel a particular action. *See* § 227.57(5).

On the same theme, Froebel contends that the circuit court should have granted relief pursuant to § 227.57(9), STATS. That section provides in part that "[t]he court's decision shall provide whatever relief is appropriate irrespective of the original form of the petition." *Id.* Again, however, Froebel's argument overlooks that the circuit court found that the ALJ had correctly interpreted the law and found no other grounds upon which to set aside or modify the agency decision. *See* § 227.57(5). Absent such a finding, we reject Froebel's contention that the circuit court should have ordered injunctive relief.

Froebel next argues that the DNR arbitrarily and capriciously exercised its discretion under § 31.187(1), STATS., when it implemented the removal of Funk's Dam in a manner inconsistent with the DNR's policy and prior practice. Froebel contends that such action provides the circuit court with separate grounds under § 227.57(8), STATS., for reversing or remanding the agency's decision. We are unpersuaded.

Section 227.57(8), STATS., provides:

> The court shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion is outside the range of discretion delegated to the agency by law; is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice, if deviation therefrom is not explained to the satisfaction of the court by the agency; or is otherwise in violation of a constitu-

> tional or statutory provision; but the court shall not substitute its judgment for that of the agency on an issue of discretion.

Because the DNR did not adhere to the sediment transport and erosion control measures set forth in its recommendations and representations to the public, Froebel argues that the circuit court was empowered to grant remedial relief under this statute.

Froebel's argument overlooks § 31.187, STATS., which affords the DNR broad discretion in dam removal. Although the DNR must hold hearings pursuant to § 31.253, STATS., prior to removing a dam, its ultimate decision to do so is subject only to a public informational hearing. As the circuit court observed, the staff-recommended procedures for the dam removal do not constitute department orders. Although the DNR offered only a limited explanation for its failure to follow all of the recommendations, it nevertheless possessed the statutory authority to remove the dam in "such manner as it deem[ed] fit." *See* § 31.187(1). Section 227.57(8), STATS., provides that "the court shall not substitute its judgment for that of the agency on an issue of discretion." The circuit court did not erroneously exercise its discretion by failing to act under § 227.57(8). Furthermore, this section allows only for the reversal or remand of the case to the agency and does not further Froebel's argument for injunctive relief.

*Sections 31.185 and 31.187, STATS.*

Next, Froebel challenges the ALJ's interpretation of §§ 31.187(1) and 31.185, STATS. Section 31.187(1) provides in relevant part:

> The department may remove or cause to be removed, *in such manner as it deems fit*, old and abandoned dams in streams in this state, upon giving 60 days' notice in writing to the owner thereof, if the owner can be found. [Emphasis added.][3]

Froebel contends that the ALJ erroneously concluded that § 31.187(1), STATS., does not impose a standard upon the DNR when it is conducting a dam removal. We disagree. Section 31.187(1) clearly allows the DNR to remove a dam, and to do so "in such manner as it deems fit." Although this is a standard which gives total discretion to the DNR, it is a standard nonetheless. Moreover, Froebel cites no authority for his proposition that a standard is required.

Froebel argues that "[i]nterpreting § 31.187(1), Stats., as giving the DNR unfettered discretion to effectuate the removal of abandoned dams and to dump hundreds of tons of sediment into a river and lake clearly violates the constitutionally derived public trust doctrine." *See* WIS. CONST. art. IX, § 1. Froebel posits that this court should instead construe § 31.187(1) "consistently with and in light of" § 31.185(5), STATS. However, we conclude that § 31.185(5) is not aimed at DNR action and thus creates a different procedure when a private party seeks to remove a dam.

Section 31.185, STATS., governs permits to abandon dams. Under subsec. (1), "[n]o owner of any dam may abandon or remove or alter the dam without first obtaining a permit from the department." Section 31.185(1). "As a prerequisite to the granting of a permit . . . the department may require the applicant to com-

---

[3] The ALJ found that the DNR met all of the procedural requirements under § 31.187, STATS. Froebel does not dispute this finding.

ply with such conditions as it deems reasonably necessary in the particular case to preserve public rights in navigable waters, to promote safety, and to protect life, health and property." Section 31.185(5).

Froebel argues that the phrase employed in § 31.187(1), STATS., "in such manner as [the DNR] deems fit" should be interpreted as imposing an obligation upon the DNR to determine a "fit" manner of removing a dam that is consistent with the obligations the DNR imposes under § 31.185(5), STATS., in light of its public trust responsibilities. Here, as with his argument under § 30.03(4), STATS., which we have already discussed, Froebel again attempts to turn the statute into a sword against the DNR. However, it is evident that the legislature did not intend the permit procedures for dam removal as applied to private parties in § 31.185 to be imposed upon the DNR when it chooses to remove a dam under § 31.187. If the legislature had so intended, it would not have created two different statutes, using wholly different language and setting out wholly different procedures. We uphold the ALJ's constructions of §§ 31.185 and 31.187.

██

Froebel further suggests that the ALJ's construction of these statutes permitted a violation of public trust. We disagree. The ALJ expressly found that "[a] clear preponderance of the credible evidence supports a Finding that the Department's decision to remove the Funk's dam was reasonable given Department concerns about public safety and sediment transport." Moreover, even if the ALJ had found otherwise, the bottom line issue in this case is whether the law of this state accords Froebel the injunctive relief which he sought. As our discussions have revealed, it does not.

*Violation of § 283.31(1), STATS.*

Next, Froebel contends that the "DNR's arbitrary and capricious exercise of discretion under § 31.187(1), Stats., also violated Wisconsin law as it caused the illegal, unpermitted discharge of pollutants from a point source." Froebel argues that the ALJ erroneously concluded that the DNR was not the owner or operator of a "point source" within the meaning of § 283.31(1), STATS.[4] Because we conclude that this dam removal project does not fall within the parameters of § 283.31(1), we reject Froebel's argument.

Section 283.31(1), STATS., governs water pollutant discharge, elimination systems and related permits. This section provides:

> **(1)**   The discharge of any pollutant into any waters of the state or the disposal of sludge from a treatment work by any person is unlawful unless such discharge or disposal is done under a permit issued by the department under this section or s. 283.33. The department may by rule exempt certain classes or categories of vessels from this section. Except as provided in s. 283.33, the department may require only one permit for a publicly owned treatment or collection facility or system, regardless of the number of point sources from such facility or system.

Froebel contends that the DNR should have obtained a permit pursuant to this statute before it removed the dam and caused the discharge of sediment.

The ALJ rejected Froebel's argument, citing testimony from Sturtevant and one other individual that the DNR does not require a Wisconsin Pollution Dis-

---

[4] We note that when this case began § 283.31(1), STATS., was § 147.02(1), STATS, 1993–94. Because this change does not affect our analysis, we refer to the current version of the statute.

charge Elimination System (WPDES) permit for a dam removal in addition to the permits required under ch. 31, STATS. The ALJ found that "[t]he Department did not err in failing to require a permit in connection with dam removal." We agree.

■■■

Chapter 31, STATS., governs the regulation of dams and bridges which affect navigable waters. Section 31.185, STATS., contains provisions which specifically govern the requirements for obtaining a permit to remove, abandon or alter a dam. As discussed above, the DNR is not obliged to obtain a permit under § 31.185 but is permitted to remove the dam in such a manner as it deems fit. *See* § 31.187(1), STATS. Section 283.31(1), STATS., does not specifically govern dam removal or its potential consequences. Under the rules of statutory construction, where a general statute conflicts with a specific statute, the specific statute prevails. *See Estate of Cavanaugh v. Andrade*, 191 Wis. 2d 244, 262, 528 N.W.2d 492, 499 (Ct. App. 1995), *rev'd on other grounds,* 202 Wis. 2d 290, 550 N.W.2d 103 (1996). Thus, § 31.185, specifically aimed at dam removal, prevails over the provisions of § 283.31(1). We conclude that the DNR was not required to obtain a permit pursuant to § 283.31.[5]

### The DNR's Role

Finally, Froebel maintains that the ALJ's and the circuit court's rulings "gave DNR preferential treatment over private party violators and allowed DNR to infringe upon the public rights and interest which the

---

[5] Moreover, like some of his other arguments, Froebel's interpretation would require the DNR to obtain a permit from itself. We reject that construction of the statute.

Legislature has charged DNR with protecting." Froebel misdirects his criticism. The ALJ's and the circuit court's authority is limited by statute. *See Jocz*, 196 Wis. 2d at 292, 538 N.W.2d at 593. The statutes pertaining to the regulation of dams and bridges affecting navigable waters are premised upon the powers of the DNR to oversee their construction and maintenance. *See* § 31.02, STATS. However, the statutes do not provide for the regulation of the DNR itself in this role, nor do they provide a manner in which the DNR may be enjoined to take specific remedial action. The ALJ, the circuit court, and now this court cannot lawfully grant Froebel's request for relief because we are bound by the statutes.

We join in the ALJ's criticisms of the DNR's practices in this case. We would expect the DNR, as the protector of this state's natural resources and the chief enforcer of our laws protecting those assets, to abide by the rules which it imposes and enforces on others. We also would expect it to abide by the promises and representations it makes to the public regarding its own activities. These expectations may perhaps explain why the legislature has not deemed it necessary to create laws which make the DNR subject to the requirements imposed on others. However, we cannot rewrite the existing laws to accommodate Froebel's legitimate complaints. His arguments and his criticisms are more properly directed to the legislature.

## CONCLUSION

We conclude that the statutes afford neither the ALJ nor the circuit court the authority to grant specific injunctive relief when the DNR causes damage during a dam removal process under § 31.187, STATS. We further conclude that the ALJ properly determined that

the DNR is subject to the dam removal procedures set forth specifically for that activity under § 31.187 and that the DNR need not obtain a permit under § 283.31(1), STATS. We affirm the circuit court order.

*By the Court.*—Order affirmed.