In the
United States Court of Appeals
For the Seventh Circuit

No. 98-3925

Kurt Froebel,

Plaintiff-Appellant,

v.

George E. Meyer, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 97-C-654--Lynn Adelman, Judge.

Argued May 14, 1999--Decided June 28, 2000

Before Flaum, Easterbrook, and Diane P.
Wood, Circuit Judges.

Diane P. Wood, Circuit Judge.  In 1992,
the Wisconsin Department of Natural
Resources ("WDNR") completed the process
of destroying Funk's Dam, which had
blocked the Oconomowoc River for nearly
150 years. After the dam was removed,
silt and sediment that had built up over
nearly 150 years damaged the river
downstream from the former dam. Kurt
Froebel believed that these actions
violated state environmental laws, so he
sought a Wisconsin administrative order
requiring the defendants to fix the
problem. His efforts were stymied both
there and on appeal to the Wisconsin
courts.

Froebel then turned to federal court,
where he filed the complaint in this
action under the citizen suit provision
of the Clean Water Act ("CWA"), 33 U.S.C.
sec. 1365 (1994). The district court held
that Froebel's suit was not barred by
claim preclusion, but that his complaint
should be dismissed for failure to state
a claim. We agree that dismissal was
proper, but for largely different
reasons. Froebel's claims, except those
against Waukesha County, are indeed

barred by claim preclusion. We agree that Froebel has not stated a claim against the county, and we therefore affirm the district court's judgment in its entirety.

I

Funk's Dam was built in 1850. It dams the Oconomowoc River near the town of Merton, Wisconsin. Over the next 115 years, it was rebuilt twice, but in 1965 it washed out and was not repaired. In 1971, WDNR informed the dam's owner, Gerald Quinn, that it needed to be fixed, but Quinn refused and in 1975 the dam washed out again. Quinn again failed to comply with the agency's orders, prompting WDNR in 1982 to declare the dam unsafe and abandoned. At that point, the agency indicated that it intended to remove the dam. However, WDNR did not have access to the funds necessary for removal until nearly ten years later.

Finally, in August 1992, WDNR began the drawdown process and conducted hearings concerning the dam's removal. On October 2, removal began. In devising its removal strategy, WDNR relied on two studies conducted by its employees. The first was a 1986 sediment survey conducted by employee Mike Bozek. The goal of the survey was to try to predict the amount of silt and soft sediment that would be sent down the river after the dam was removed. Based on his study, Bozek recommended that WDNR construct a sediment pit upstream from the dam. The other study was a drawdown plan prepared by WDNR Assistant Dam Safety Engineer William Sturtevant. Sturtevant's plan recommended pumps and siphons to remove sediment, as well as traps both upstream and downstream from the dam. Based on the minimal consequences to the river if these plans were followed, WDNR decided that an environmental impact analysis would be unnecessary.

Unfortunately, the dam removal did not proceed in nearly as orderly a fashion as it would have if either Bozek's or Sturtevant's plan had been followed. WDNR officials and contractors concluded that Sturtevant's recommendations were not feasible given the conditions surrounding Funk's Dam, but they do not appear to have spent a great deal of time developing alternatives. No upstream

sediment trap was put in place, and the downstream trap was inadequate for the task (though this may be because Bozek's study severely underestimated the likely sediment flow after removal). Moreover, there is at least some indication that WDNR's contractor took silt from the downstream trap and, rather than transporting it down river, pumped it right back into the channel near the dam. The consequences of all of this for the Oconomowoc River were severe--muck and silt bars replaced the gravel spawning grounds for indigenous fish and much of the local flora was buried under a foot of silt.

Meanwhile, the North Lake Management District ("District") filed a petition for a contested case hearing to challenge WDNR's actions. Froebel, an area resident who frequently used that region of the river for hunting and fishing, intervened. The District and WDNR settled, leaving Froebel as the sole plaintiff against WDNR. The first step was an administrative hearing before Wisconsin Administrative Law Judge Jeffrey Boldt. Froebel requested an order requiring WDNR to undertake remedial steps to repair damage done to the river. However, ALJ Boldt concluded that WDNR had acted within the discretion conferred by Wisconsin statutes and refused to order any remedial actions. Under Wisconsin's administrative review statute, Froebel's next stop was the circuit court (Wisconsin's first level of courts) for Waukesha County. That court affirmed the ALJ's conclusions, also finding that a provision of Wisconsin's dam removal code conferred upon WDNR the discretion to remove the dam as it saw fit. Froebel appealed to the Wisconsin Court of Appeals, which also affirmed. Froebel v. Wis. Dept. of Natural Resources, 579 N.W.2d 774 (Wis. Ct. App. 1998). The appellate court reasoned that since Froebel did not show that WDNR had acted contrary to any Wisconsin statute, the circuit court could not order injunctive relief against it.

Having no luck in Wisconsin courts, Froebel then brought a citizen's suit under the CWA. See 33 U.S.C. sec. 1365. He sued WDNR, as well as Sturtevant and WDNR Secretary George Meyer (collectively, the "state defendants"), alleging that WDNR's actions violated

both Section 402, 33 U.S.C. sec. 1342, and Section 404, 33 U.S.C. sec. 1344, of the CWA. Section 402 establishes the National Pollutant Discharge Elimination System ("NPDES"), which creates a permitting program for the discharge of pollutants. Froebel contends that the silt that was sent through the dam is a pollutant and that WDNR thus violated Section 402 by failing to comply with the permit requirement. Section 404 regulates the discharge of fill materials into navigable waters and creates a permitting scheme administered by the U.S. Army Corps of Engineers. Froebel argues that the removal of Funk's Dam led to a discharge of fill materials for which WDNR should have sought a permit.

Additionally, Froebel added a new defendant in his federal complaint, Waukesha County. The county was not involved in the removal of Funk's Dam, but it owned the property on which the dam was located at the time Froebel brought his federal suit. Froebel concedes that Waukesha County had nothing to do with the events of 1992, but he argues that the county continues to violate Sections 402 and 404 because the particles that naturally flow down the river past the point where the dam used to be constitute both a pollutant and fill material.

The district court dismissed WDNR on sovereign immunity grounds. In Froebel's favor, it ruled both that the action against Meyer and Sturtevant was a proper application of Ex parte Young, 209 U.S. 123 (1908), and that the Wisconsin judgment did not have the effect of precluding Froebel's federal claims. Having won these battles, Froebel nonetheless lost the war: the district court ultimately ruled that Froebel had failed to state a claim under either Section 402 or Section 404. Froebel now appeals everything except the dismissal of WDNR.

II

Since Wisconsin courts have already rendered a judgment in an action between Froebel and WDNR, claim preclusion is an obvious concern. By not having raised his CWA claims before either the Wisconsin administrative law judge or the Wisconsin courts, Froebel may now be precluded from

asserting a Clean Water Act violation in conjunction with the very same dam removal that formed the basis of his earlier Wisconsin action.

A

Before we examine claim preclusion, however, we must first address a waiver problem created by the defendants' briefing strategy. On appeal, only Waukesha County raises a preclusion argument. The state defendants dedicate their entire brief to the merits of Froebel's Section 402 and 404 claims, as well as their argument that they enjoy sovereign immunity. Ordinarily, this would be a substantial problem, since arguments not raised in a brief are usually deemed waived. See, e.g., Hentosh v. Herman M. Finch University of Health Sciences/The Chicago Medical School, 167 F.3d 1170, 1173 (7th Cir. 1999); Finance Investment Co. (Bermuda) Ltd. v. Geberit AG, 165 F.3d 526, 531 (7th Cir. 1998); Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999). The state defendants did not even coordinate their briefing with that of the county and indicate that they were adopting the county's preclusion argument by reference, as they might have done. See Fed. R. App. P. 28(i); Bruner Corp. v. R.A. Bruner Co., 133 F.3d 491, 498 n.7 (7th Cir. 1998). Under the circumstances, we think it inappropriate to extend the County's preclusion arguments to the state defendants.

Nonetheless, the fact that the district court ruled in the defendants' favor, and explicitly addressed the preclusion issue, saves them from themselves. Because their position on appeal seeks only to maintain the status quo, we apply "a degree of leniency" to the state defendants' failure to raise all possible grounds for affirming the lower court. See Schering Corp. v. Illinois Antibiotics Co., 89 F.3d 357, 358 (7th Cir. 1996) (noting that "[t]he urging of alternative grounds for affirmance is a privilege rather than a duty"). This means that so long as the state defendants did not waive their preclusion argument by failing to present the issue to the district court, we may consider it. Door Systems, Inc. v. Pro-Line Door Systems, Inc., 83 F.3d 169, 173 (7th Cir. 1996).

From that standpoint, the state

defendants are on firm ground: they raised their preclusion argument before the district court. In addition, our consideration of this point vis a vis the state defendants (as opposed to the County) will not prejudice Froebel. The fact that Waukesha County raised the argument on appeal means that Froebel was prepared to meet the point. Indeed, he addresses it in his reply brief, where he makes the erroneous point that the County would have had to file a cross-appeal to preserve the right to attack the district court's ruling on this issue. No cross-appeal is necessary unless the appellee wants the court of appeals to alter the judgment, not just the reasoning, of the district court. See Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co., 165 F.3d 1157, 1159 (7th Cir. 1999).

B

Under 28 U.S.C. sec. 1738, federal courts must give the judgments of state courts the same full faith and credit that those judgments would receive in the rendering state's courts, as long as the state judgment satisfied constitutional due process requirements. Kremer v. Chemical Constr. Corp., 456 U.S. 461, 481-82 (1982). See also Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 373 (1996); Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985). Even if the state court formally would not have had jurisdiction to hear the later claim, because it fell within the exclusive jurisdiction of the federal courts, sec. 1738 requires the federal court to analyze the case by asking what preclusive effect the state would give the first judgment in analogous circumstances. Marrese, 470 U.S. at 380. The question for us is therefore whether the Wisconsin courts would find the CWA action Froebel has brought precluded by his prior litigation. We conclude that they would.

The Wisconsin Supreme Court recently summarized its approach to deciding when a subsequent action is barred in Sopha v. Owens-Corning Fiberglas Corp., 601 N.W.2d 627 (Wis. 1999). There the court indicated that three factors had to be present in order to preclude the later action:

(1) identity between the parties or their privies in the prior and present suits; (2) prior litigation resulted in a final judgment on the merits by a court with jurisdiction; and (3) identity of the causes of action in the two suits.

Id. at 637. See also Northern States Power Co. v. Bugher, 525 N.W.2d 723, 728 (Wis. 1995).

The first question is therefore whether the parties here are the same, legally speaking, as the parties who participated in the Wisconsin proceedings. The answer is yes, because of the way Wisconsin treats challenges to administrative action. While the Wisconsin action named only WDNR, Froebel's current action is targeted at not only WDNR but also Meyer (in his official capacity), Sturtevant (in his individual capacity), and Waukesha County. Under Wisconsin preclusion law, Meyer and Sturtevant are viewed as identical to WDNR since Froebel's complaints against them concern only their actions as employees of the agency. See Northern States Power, 525 N.W.2d at 728 (finding identity of parties in prior suit against agency and action against officers acting in their official capacities); Lindas v. Cady, 499 N.W.2d 692, 699 (Wis. Ct. App. 1993) (holding that a suit against an employer generally precludes subsequent suits against the employees, even in their individual capacities, when the conduct forming the basis of the complaint was part of the employees' job functions), aff'd on other grounds, 515 N.W.2d 458 (Wis. 1994).

Waukesha County is different. There is no indication from the record that Waukesha County (which is a party to this case only because it owns the land on which Funk's Dam used to sit) had anything to do with either the decision to remove the dam or Froebel's litigation in the Wisconsin courts. It is therefore unlikely that if Froebel were to bring a suit solely against the county in Wisconsin court that the court would dismiss his case on claim preclusion grounds. Moreover, the county and WDNR defendants were represented by different counsel both in the district court and on appeal, a fact that the Wisconsin Supreme Court suggests is important in evaluating whether parties are identical for

preclusion purposes. See Northern States Power, 525 N.W. 2d at 728. Because the County cannot satisfy the first factor, Froebel's claims against it are not barred; we discuss them below.

The third factor--identity of the causes of action--is also satisfied under Wisconsin's transactional approach to claim preclusion. Under this approach, "the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Northern States Power, 525 N.W.2d at 729, quoting Restatement (2d) of Judgments sec. 24(1) (1982). The Wisconsin courts focus on facts, not legal theories, to determine whether an action is precluded. See Northern States Power, 525 N.W.2d at 729 ("[T]he number of substantive theories that may be available to a plaintiff is immaterial-- if they all arise from the same factual underpinnings they must all be brought in the same action or be barred from future consideration."). Here, Froebel is complaining about the procedures employed in the 1992 removal of Funk's Dam, just as he did before the Wisconsin ALJ and courts. The two cases arise out of the same transaction or series of transactions.

We have saved the second factor for last because it presents additional complications. The Wisconsin proceedings plainly ended in a final judgment on the merits of Froebel's challenge to WDNR's conduct in removing Funk's Dam. The fact that Froebel's first case began in an administrative setting does not change this fact. Acharya v. Am. Fed'n of State, County, and Municipal Employees, 432 N.W.2d 140, 142 (Wis. Ct. App. 1988). Compare City of Chicago v. Intern. College of Surgeons, 522 U.S. 156 (1997) (supporting removal jurisdiction in a case that began as an administrative proceeding, that was appealed to the state circuit court where federal claims were added to the administrative review issues, and that was then removed to federal court). On the other hand, the judgment must have been rendered "by a court with jurisdiction." That phrase implicates one of the exceptions to the rule against claim splitting recognized by the Restatement (Second) of Judgments,

which the Wisconsin Supreme Court normally follows. See, e.g., Sopha, 601 N.W.2d at 637. Section 26 of the Second Restatement outlines exceptions to the general rule against claim splitting, and one of those exceptions is as follows:

(c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief . . . .

Restatement (2d) Judgments sec. 26(1)(c).

Froebel argues that this was precisely his problem in the Wisconsin proceedings: he is now presenting a federal Clean Water Act claim that, he says, would not have been entertained in the state proceedings because of limitations on the authority of those tribunals. If that were true, then it is our best guess that Wisconsin itself would permit this later suit, and thus it could proceed in federal court. Compare Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc., 159 F.3d 129, 140 (3d Cir. 1998) (finding that New York courts, which also follow the transactional approach to claim preclusion, would so rule). But, unlike the litigant in Crossroads, Froebel never even asked the Wisconsin administrative or judicial tribunals to entertain his CWA claims, and it appears to us that, had he asked, they could have done so.

The first indication that this is true comes from Northern States Power, in which the Supreme Court of Wisconsin considered a claim preclusion problem similar to the one presented in this case. There, a Wisconsin taxpayer failed to raise a federal constitutional challenge to a decision by the Wisconsin Department of Revenue denying a claimed deduction, instead relying solely on its interpretation of the governing Wisconsin statute. Northern States Power, 525 N.W.2d at 726. The taxpayer then brought a claim under 42 U.S.C. sec. 1983 against various state officials, alleging that

the state tax was unconstitutional as applied to its case. The Wisconsin Supreme Court held that the Section 1983 suit was barred by claim preclusion because the taxpayer failed to raise the federal constitutional issue before either the state administrative agency or the reviewing courts. This, of course, is a precise parallel to Froebel's case: after failing to raise any Clean Water Act issues in state proceedings, he now wishes to vindicate federal rights in a subsequent suit.

The district court concluded that Northern States Power was distinguishable from Froebel's situation because it believed that the Wisconsin administrative tribunal and courts in Northern States Power had the authority to grant the requested relief, whereas here the Wisconsin Court of Appeals indicated that neither the administrative agency nor the state lower court could grant Froebel's request for an injunction. As a result of this conclusion, the district court thought that it would be fundamentally unfair to apply preclusion to Froebel's current claim because of the limits on the Wisconsin courts' remedial powers. The district court was right to raise these equitable considerations, since "Wisconsin law does not treat res judicata as an ironclad rule which must be implacably applied whenever its literal requirements are met, regardless of any countervailing considerations." Sopha, 601 N.W.2d at 638, quoting Patzer v. Board of Regents, 763 F.2d 851, 856 (7th Cir. 1985). See also McCourt v. Algiers, 91 N.W.2d 194, 196 (Wis. 1958) (indicating that res judicata may not apply where relitigation is necessary to prevent unfairness).

That said, we believe that the district court misinterpreted the Wisconsin courts' reasons for disposing of Froebel's claim. Wis. Stat. sec. 227.57(9), which prescribes the procedures for judicial review of agency actions, allows the reviewing court "to provide whatever relief is appropriate irrespective of the original form of the petition." In the Wisconsin litigation, Froebel contended that this section granted the reviewing court the power to enjoin WDNR and compel a restoration of the affected region of the Oconomowoc

river. The court of appeals rejected this claim, but did so because "the circuit court found that the ALJ had correctly interpreted the law and found no other grounds upon which to set aside or modify the agency decision." Froebel, 579 N.W.2d at 780-81. In other words, the Wisconsin circuit court could not enjoin the defendants because it found no legal basis for doing so. Along the same lines, the court of appeals held that Wis. Stat. sec. 227.57(2) requires a reviewing court to affirm an agency decision "unless the court finds a ground" for setting it aside or modifying it. Id. So, the reason that WDNR could not be enjoined was that Froebel had not presented a legal basis for doing so.

The federal Clean Water Act might have provided such a basis. Other Wisconsin cases indicate that it is permissible to raise federal environmental law in state administrative litigation. See, e.g., Badger Paper Mills, Inc. v. Wis. Dept. of Natural Resources, 452 N.W.2d 797, 800 (Wis. Ct. App. 1990) (requiring party to raise Clean Water Act arguments before ALJ prior to seeking state judicial review). Supposing that Froebel's claim that the state defendants had violated the Clean Water Act is correct, ALJ Boldt may have concluded that WDNR was acting illegally. Froebel could have further argued this point to the Wisconsin state courts. Under yet another section of the Wisconsin administrative review provisions, Wis. Stat. sec. 227.57(8), a reviewing court "shall reverse or remand the case to the agency if it finds that the agency's exercise of discretion . . . is otherwise in violation of a constitutional or statutory provision." There is no reason to think that Froebel could not have argued to both the ALJ and the circuit court that the Wisconsin provisions as interpreted by WDNR violated the federal Clean Water Act. If he prevailed, then the Wisconsin courts would have concluded that WDNR's removal of Funk's Dam was "otherwise in violation of a constitutional or statutory provision." That would have offered a basis in law to modify the ALJ's decision and, under sec. 227.57(9), fashion appropriate relief.

Furthermore, the Wisconsin courts' reasoning in disposing of Froebel's claim makes it clear that the outcome of his

state case could have been very different had he chosen to raise the Clean Water Act arguments that he makes here. Both the Wisconsin circuit and appellate courts upheld WDNR's actions by reference to Wis. Stat. sec. 31.187(1), which provides:

The department may remove or cause to be removed, in such manner as it deems fit, old and abandoned dams in streams in this state, upon giving 60 days' notice in writing to the owner thereof, if the owner can be found.

The court of appeals concluded that the authority to remove dams "as it deems fit" confers on WDNR nearly unfettered discretion with respect to dam removal. Froebel, 579 N.W. 2d at 781.

However, there is no doubt that Wisconsin cannot give discretion to its administrative agencies to violate federal law, since such a statute would run contrary to the Supremacy Clause. See U.S. Const. Art. VI, sec. 2. If Froebel's substantive claim--that WDNR violated both Section 402 and Section 404 of the Clean Water Act--is correct, then Wis. Stat. sec. 31.187 cannot extend to WDNR the complete discretion that the Wisconsin courts found. See, e.g., Ray v. Atlantic Richfield Co., 435 U.S. 151, 158 (1978) ("[A] state statute is void to the extent that it actually conflicts with a valid federal statute."). We presume that Wisconsin officials and courts would have faithfully applied federal standards if Froebel had given them the chance. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 274 (1997). So, if Froebel is right on the merits, we doubt that the Wisconsin courts would have interpreted Wis. Stat. sec. 31.187 to give the agency the authority to act anyway.

In short, Northern States Power indicates that Froebel's present action against the state defendants could have been entertained in the earlier Wisconsin proceeding. For those who are keeping score, we note that we have now made equivalent findings with respect to this aspect of claim preclusion for each of the three states within the circuit. See Button v. Harden, 814 F.2d 382 (7th Cir. 1987) (Illinois law); confirmed by Stratton v. Wenona Community Unit Dist. No. 1, 551 N.E.2d 640, 646-47 (Ill.

1990); Leal v. Krajewski, 803 F.2d 332, 335 (7th Cir. 1986) (Indiana law); Atkins v. Hancock County Sheriff's Merit Board, 910 F.2d 403 (7th Cir. 1990) (Indiana law, following Leal).  Here, we find that all three requirements of Wisconsin's rule for claim preclusion are satisfied, and Froebel's new suit is barred.

III

   Finally, we consider Froebel's claims against Waukesha County. Unfortunately for Froebel, the same lack of county involvement in the dam removal that saved his case from preclusion also undercuts both of the CWA theories that he presented in his complaint.

   Froebel's first CWA claim is based on Section 402 of the CWA, requiring a permit for "the discharge of any pollutant, or combination of pollutants." 33 U.S.C. sec. 1342(a)(1). "Discharge of a pollutant," in turn, is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. sec. 1362(12)(A). "Point source" is also a defined term; it means "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. sec. 1362(14).

   We have not specifically decided whether and when a dam can serve as a point source, but several other circuits have dealt with this issue and all have concluded that, at least under some circumstances, a dam can meet the statutory definition of point source. Committee to Save Mokulumne River v. East Bay Municipal Utility District, 13 F.3d 305, 308 (9th Cir. 1993); National Wildlife Federation v. Consumers Power Co., 862 F.2d 580, 584 (6th Cir. 1988); National Wildlife Federation v. Gorsuch, 693 F.2d 156, 165 n.22 (D.C. Cir. 1982); Missouri ex rel. Ashcroft v. Department of the Army, 672 F.2d 1297, 1304 (8th Cir. 1982). In concluding that a dam is a "point source," these other courts have looked at the outlets from the dam itself, such as spillways, pipes, and valves. See, e.g., Committee to Save

Mokulumne River, 13 F.3d at 308, Gorsuch, 693 F.2d at 165.

Our case, at least as far as Waukesha County goes, presents a very different problem. Funk's Dam is mostly gone, and the supposed "point source" is really nothing more than the hole through which the Oconomowoc River now flows unrestrained. Froebel's theory is that the former dam impoundment and a portion of a river channel can constitute a "point source" just because there used to be an artificial structure at that spot. Such a reading, however, has a number of problems. The first and most obvious is that the definition of "discharge of a pollutant" requires that the pollutant flow "to navigable waters from any point source." The most natural reading of this language is that the point source is distinct from navigable water.

The structure of the CWA's definition of "point source" (a "discernible, confined, and discrete conveyance . . . from which pollutants are or may be discharged") connotes the terminal end of an artificial system for moving water, waste, or other materials. See United States v. Plaza Health Laboratories, 3 F.3d 643, 646 (2d Cir. 1993) (noting that the definition "evoke[s] images of physical structures and instrumentalities that systematically act as a means ofconveying pollutants from an industrial source to navigable waterways"). If, for example, Waukesha County were precipitating silt from the impoundment into a pile on the riverbank, then pumping it back into the waterway using a pipe, the pipe would be a point source. Whether there would be an addition as understood in Section 402 we need not decide.

Finally, our reading is further reinforced by the fact that we apply a broad construction to the term "navigable water." United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 133 (1985); Village of Oconomowoc Lake v. Dayton Hudson Corp., 24 F.3d 962, 964 (7th Cir. 1994). Compare Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, 191 F.3d 845 (7th Cir. 1999), cert. granted 68 U.S.L.W. 3719 (U.S. May 23, 2000) (No. 99-1178) (raising the question, not at issue here, whether the navigable waters

encompass all areas used as habitat by migratory birds). The broad reach of "navigable waters" pushes the natural reading of "point source" back to the point at which an artificial mechanism introduces a pollutant. If, for example, an industrial polluter operated a facility that dumped waste into a pond that feeds a tributary to a river that flows to the ocean, the facility would be the point source. Otherwise, any point at which one waterway empties into another could be construed as a "point source," subjecting unsuspecting owners of these confluences to liability when pollutants flow downstream.

Froebel's other CWA claim against the county is based on Section 404, 33 U.S.C. sec. 1344, which establishes a permitting system for discharging dredged or fill material. He argues that the removal of the dam, as well as the ongoing scouring action of the river water as it passes through what used to be the Funk's Dam impoundment, constitutes a discharge of dredged or fill material that requires a permit.

The problem with Froebel's theory is that there is nothing in either the regulations or the case law interpreting Section 404 that indicates that a landowner can fall within the permit requirement for a "discharge" by doing absolutely nothing at all. A "discharge of dredged material" refers to "any addition of dredged material . . . including redeposit of dredged material other than incidental fallback" intonavigable water. 33 C.F.R. sec. 323.2(d)(1). Similarly, a "discharge of fill material" is "the addition of fill material into waters of the United States." 33 C.F.R. sec. 323.2(f). The reference to "addition" and "redeposit" strongly suggest that a Section 404 permit is required only when the party allegedly needing a permit takes some action, rather than doing nothing whatsoever (as Waukesha County has done here).

Froebel's theory is that as water passes through the opening where Funk's Dam used to be, it scours silt off of the bottom of the impoundment (the dredging), then deposits it downstream (the discharge or, alternatively, the fill for which Section 404 mandates a permit). It is not at all

difficult to imagine that water could be used to dredge or fill a riverbed when a person directs the water for that purpose. However, Froebel presents no authority for the proposition that dredging can be a purely passive activity. He relies heavily on United States v. M.C.C. of Florida, Inc., 772 F.2d 1501, 1506 (11th Cir. 1985). But M.C.C. just holds CWA is not limited to a narrow conception of dredging or filling-- active, purposeful digging. In M.C.C., it was the churning action caused by the defendant's boat operations that was the source of the dredging that the court found to fall within Section 404. But the point is that the defendant was doing something. So, while it is possible that the state defendants have engaged in unlawful dredging by removing Funk's Dam and allowing the Oconomowoc River to clean out the impoundment, Waukesha County has not.

Section 404, its underlying regulations, and cases applying its terms all have a common element that is lacking in Froebel's claims against Waukesha County--active conduct that results in the discharge of dredged or fill material. If the county were to pile silt on the riverbank and deliberately allow rainfall to wash it into the stream, then Section 404 might become relevant. Here, however, Froebel's claim would essentially require Waukesha County to seek a permit to do nothing but continue to own the land. As even Froebel conceded at oral argument, that cannot be a correct interpretation of Section 404.

IV

Because Froebel's suit against the state defendants is barred by the judgment in the prior Wisconsin proceedings and his complaint does not state a cause of action against Waukesha County, the judgment of the district court is Affirmed.